# EXHIBIT 1

FILED
2/25/2025 10:50 AM
ERIN CARTWRIGHT WEINSTEIN
Clerk of the Circuit Court
Lake County, Illinois

IN THE CIRCUIT COURT OF THE NINETEENTH JUDICIAL CIRCUIT
LAKE COUNTY, ILLINOIS

| | |
|---|---|
| ALTA WATERFORD, LLC, an Illinois Foreign Corporation; | ) ) ) |
| Plaintiff, | ) |
| VS. | ) Gen No. 2025LA00000158 |
| ConnectM Technology Solutions, Inc., a Delaware Corporation; and | ) ) ) ) |
| Bhaskar Panigrahi, an individual; | ) ) |
| Defendants. | ) |

**NOTICE PURSUANT TO LCR - 2-2.14**
THIS CASE IS HEREBY SET FOR AN INITIAL CASE MANAGEMENT CONFERENCE IN COURTROOM C202 ON 5/20/2025 AT 9 AM A.M./P.M.
FAILURE TO APPEAR MAY RESULT IN THE CASE BEING DISMISSED OR AN ORDER OF DEFAULT BEING ENTERED.

## COMPLAINT

NOW COMES the Plaintiff, ALTA WATERFORD, LLC, by its attorney, The Law Office of George W. Svoboda, and brings this complaint against Defendant for breach of contract and states as follows:

### PARTIES

1. Plaintiff, Alta Waterford, LLC, is an Illinois foreign corporation and a citizen of St. Kitts & Nevis and maintains its principal place of business at Hunkins Plaza, Charlestown, St. Kitts & Nevis and is engaged generally in the delivery of investor relations and marketing services.

2. Plaintiff is informed and believes, and thereon alleges, that Defendant ConnectM Technology Solutions, Inc. (hereinafter referred to as "CNTM"), is a Delaware corporation and maintains its principal place of business at 2 Mt Royal Avenue, Suite #550, Marlborough, MA 01752 and is a publicly traded company that generally require the services of Plaintiff.

3. Plaintiff is informed and believes, and thereon alleges, that Defendant, Bhaskar Panigrahi, is a citizen of Massachusetts and maintains her residence at 26 Southwood Dr Southborough, MA 01772.

1 of 4

## JURISDICTION AND VENUE

4. This Court has jurisdiction because the Plaintiff is registered to do business in Illinois and pursuant to the contract described herein below, Defendant CNTM agreed that the contract would be governed by the laws of the State of Illinois. In addition, the agreement provides, in pertinent part, as follows: "All disputes, controversies, or claims arising out of, or in connection with, this Agreement shall be litigated in any state or federal court in Illinois." Venue is proper in Lake County, Illinois because the Plaintiff maintains its registered agent in Lake County, Illinois.

## ALLEGATIONS OF FACT

5. The Defendant owes Plaintiff at least $202,000.00.

6. On or about January 8, 2025, the Defendant agreed in a written contract (hereinafter referred to as a "Agreement") to pay Plaintiff for investor relations services and to generally increase the liquidity of trading volume in the Defendant's stock. A true and correct copy of the Agreement is attached hereto as Exhibit "1" and incorporated herein by reference.

7. The term of the Agreement was one month.

8. Plaintiff performed the investor relations services agreed to in the contract by disseminating CNTM's news releases to Plaintiff's list of subscribers to Plaintiff's investment newsletters.

9. Plaintiff invoiced the Defendant in the amount of $100,000.00 for the work performed.

10. Section 6 of the Agreement provides for daily interest of $250.00 if payment is not received after five days. As of February 24, 2025, the total late fee amount was $2,000.00.

11. Section 19 of the Agreement provides that the Agreement will automatically rollover into a new contract on the same terms with payment due on the date of rollover.

12. On February 8, 2025, the Agreement rolled over in accordance with Section 19.

13. Plaintiff invoiced the CNTM $100,000.00 for the rollover contract.

14. CNTM refused to pay either invoice.

15. Section 13 of the Agreement provides for attorney's fees for collection, specifically that "If the Service Provider deems that the Customer is in breach or default under this contract, the Customer shall reimburse the Service Provider upon demand for any legal fees and court (or other administrative proceeding such as arbitration) costs or expenses that the Service Provider incurs in connection with the breach or default, regardless whether suit is commenced or judgment entered. **Such costs shall include legal fees, including contingency based attorney's fees at the rate in Service Provider's attorney fee agreement**, and costs incurred in the negotiation of a settlement, enforcement of rights, litigation expenses or otherwise." *Emphasis added.*

16. Defendant, Bhaskar Panigrahi, personally guaranteed payment for the services in Section 14 of the Agreement and accepted Illinois jurisdiction.

17. Defendant, Bhaskar Panigrahi, signed the Agreement "Individually & On Behalf of" CNTM.

18. The Defendant has not paid Plaintiff even after multiple demands.

## COUNT I – BREACH OF CONTRACT

19. Plaintiff repeats and realleges paragraphs 5 through 18 as if fully set forth herein.

20. Plaintiff offered to perform services to the Defendant.

21. The Defendant agreed to and accepted the terms of the offer and agreed to pay the Plaintiff for its services.

22. The parties entered into a written contract by signing the Agreement.

23. The Defendant refused and failed to pay Plaintiff in breach of the contract.

WHEREFORE, Plaintiff prays for relief as set forth below.

### COUNT II – BREACH OF GUARANTEE (Bhaskar Panigrahi)

24. Plaintiff repeats and realleges paragraphs 5 through 18 as if fully set forth herein.

25. Defendant, Bhaskar Panigrahi, guaranteed payment for the services in the contract by signing the contract including the guarantee in Section 14.

26. CNTM failed to pay the Plaintiff for its services.

27. Bhaskar Panigrahi failed to pay Plaintiff in breach of the guarantee.

WHEREFORE, Plaintiff prays for relief as set forth below.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for Judgment against Defendants as follows:

- For monetary damages in the amount of at least $202,000.00;
- For costs of suit incurred herein;
- For attorney's fees pursuant to the Agreement; and
- For whatever additional relief this Court deems just and equitable.

Respectfully submitted,

By: /s/ George W. Svoboda
Attorney for Plaintiff

George W. Svoboda #6220463
The Law Office of George W. Svoboda
P.O. Box 1299
McHenry, IL 60051
(224) 360-0696 – Phone
Email: george@georgesvobodalaw.com

## VERIFICATION

    Under the penalties of perjury as provided by law pursuant to Section 1-109 of the Code of Civil Procedure, the undersigned certifies that the statements set forth in this instrument are true and correct, except as to matters therein stated to be on information and belief and as to such matters the undersigned certifies as aforesaid that the undersigned verily believes the same to be true.

Date: 2/25/25

_____
On behalf of Plaintiff

**EXHIBIT "1"**

**THIS AGREEMENT FOR SERVICE (this "Agreement"), dated on this 8th day of January, 2025**

**BETWEEN**

**ConnectM Technology Solutions, Inc.**
419 Webster
Monterey, CA 93940

**(the "Customer")**

- AND -

**Alta Waterford LLC**
Hunkins Plaza,
Charlestown, St. Kitts & Nevis

**(the "Service Provider")**

**BACKGROUND:**

A. The **Customer** is of the opinion that the **Service Provider** has the necessary qualifications, experience, and abilities to provide services to the **Customer**.

B. The **Service Provider** is agreeable to providing such services to the **Customer** on the terms and conditions set out in this Agreement.

C. The **Customer** desires to engage the services of the **Service Provider** to perform the Customer's consulting services regarding all phases of the **Customer's** investor awareness. The **Service Provider** will consult with the **Customer** to undertake the Customer's investor awareness activities in the regulated securities industry.

D. The parties agree to do everything necessary to ensure that the terms of this Agreement take effect. This will include any actions required as a pre-requisite by the **Customer**. **Customer** will provide **Service Provider** with current news on ConnectM Technology Solutions, Inc.'s company.

**IN CONSIDERATION OF** the matters described above and of the mutual benefits and obligations set forth in this Agreement, the receipt and sufficiency of which consideration is hereby acknowledged, the parties to this Agreement agree as follows:

<u>Investor Awareness Agreement Goals</u>

1. Below are goals of the Agreement:

    a. Increase the share price by building a large base of new retail shareholders and distributing fundamental information about ConnectM Technology Solutions, Inc.. Clients typically experience roughly a 20% increase in share price during the initial month.

    b. Communicate regularly to new retail investors about ConnectM Technology Solutions, Inc.'s milestones and press releases.

    c. Provide retail liquidity and increase average trading liquidity volume, defined as both buying and selling activities. Clients typically experience roughly a 35% increase in trading liquidity within the first month.

    d. Increase the retail investor share base by marketing the company's fundamentals directly to investors.

    e. Mitigate share price depreciation due to negative publicity by providing crisis management press relation services. Communicate directly with shareholders regarding any issues to sustain share price.

    f. Increase the market cap to meet the NASDAQ compliancy requests for ten days.

**Investor Awareness Services Provided**

2. The **Customer** agrees to engage the **Service Provider** to provide the Customer with services that may include any of the following activities: (the "Services"):

    a. Disseminating the company's new release(s) ("the Release") on ConnectM Technology Solutions, Inc.

    b. Build landing pages hosted online aimed at potential investors, describing the company's business and its self-defined value to potential shareholders.

    c. Writing and distributing opt-in and compliant emails to generate interest on the part of existing and potential shareholders in ConnectM Technology Solutions, Inc.'s business.

    d. Sending opt-in text messages to investors about ConnectM Technology Solutions, Inc.'s business.

    e. Buying targeted advertising and online media to market landing pages created containing investor information about ConnectM Technology Solutions, Inc.'s business.

    f. Directly calling large retail investors and sharing information about ConnectM Technology Solutions, Inc.'s business.

    g. Leveraging social media platforms including Facebook, Instagram, and Twitter to distribute information about the ConnectM Technology Solutions, Inc.'s business.

**Term of Agreement**

3. The term of this Agreement will begin on the date of this Agreement (or on an otherwise mutually agreed commencement date) and will remain in full force for <u>one month</u>.

4. The **Customer** can adjust the start date of the Agreement via written email to the **Service Provider**.

**Compensation**

5. <u>There is no money to be given to the Service Provider upon execution of this Agreement</u>. The **Service Provider** shall be compensated as described in Paragraph 5a.

    a. The **Service Provider** will be compensated $100,000 (one hundred thousand) dollars from the **Customer** for this Agreement.

    b. Payment to the **Service Provider** must be made by the **Customer** 30 days after execution of this Agreement.

    c. The **Service Provider** shall provide payment wire settlement details to a third-party bank account via email to the **Customer**. The payment details will differ from the **Service Providers** business this Agreement is with.

6. The **Customer** understands that the **Service Provider**'s compensation as provided in this Agreement will constitute the full and exclusive monetary consideration and compensation for all services performed by the **Service Provider** in this Agreement. Payment of money (Paragraph 5a) must be made to the **Service Provider** by the **Customer** within (5) days once the **Customer** is invoiced by the **Service Provider**. If payment is not made to the **Service Provider** in (5) days, the **Customer** will incur a daily interest of $250.00 to be paid in addition to the compensation outlined in Paragraph 5a. This amount will accrue concurrently for each late invoice.

7. The **Service Provider**'s expenses for providing the services described in this Agreement are included in the compensation amount. Any services to be provided by the **Service Provider** to the **Customer** that are outside of the scope of this Agreement will be subject to a separate Agreement.

**Confidentiality**

8. "Confidential Information," means information that is not generally known and that is proprietary to the **Customer** or that the **Customer** is obligated to treat as proprietary. This information includes, without limitation trade secret information about the **Customer** and its products, information concerning the **Customer's** business as the **Customer** has conducted it since the **Customer's** incorporation or as it may conduct it in the future; and information concerning any of the **Customer's** past, current, or possible future products, including, without limitation, information about the **Customer's** research, development, engineering, purchasing, manufacturing, accounting, marketing, selling, or leasing efforts. Any information reasonably considered to be Confidential Information that the **Customer** shall be treated as Confidential Information and be presumed to be Confidential Information whether **Service Provider** or others originated it and regardless of how it obtained it. Except as required in its duties to the **Customer** and with written approval by the **Customer**, the **Service Provider** will never, either during or after the term of this Agreement, use or disclose Confidential Information to any person not authorized by the **Customer** to receive it. The **Service Provider** agrees that they will not disclose, divulge, reveal, report or use, for any purpose, any Confidential Information with respect to the business of the **Customer**, which the **Service Provider** has obtained, except as will be necessary or desirable to further the business interests of the **Customer**.

**Ownership of Materials**

9. The **Service Provider** must ensure that only true and accurate information is published about the **Customer's** company. The **Service Provider** has the option verify this by approving the content from the **Customer** to be distributed before it is published. If content is provided by the **Service Provider**, it is the **Customer's** responsibility to promptly review the content and make any necessary edits or adjustments to ensure compliance with regulations. If the content provided by the **Service Provider** is not promptly approved or edited, the **Service Provider** will assume that the content is accurate and confirmed by the **Customer**. All materials developed or produced by the **Service Provider** under this Agreement will be the property of the **Service Provider**, and the use of these materials by the **Service Provider** will not be restricted in any manner. In order to protect the trade secrets of the **Service Provider**, the **Service Provider** is not required to provide any documentation or reporting during the Agreement. This includes the names of the publications, individuals that the **Service Provider** communicates with, the number of disseminations, and any other related items. The **Customer** acknowledges that the use of the **Service Provider's** intellectual property is sufficient consideration for the services outlined in this Agreement.

**Assignment**

10. The **Service Provider** will not voluntarily or by operation of law assign or otherwise transfer its obligations under this Agreement without the prior written consent of the **Customer**.

**Capacity / Independent Contractor**

11. It is expressly agreed that the **Service Provider** is acting as an independent contractor and not as an employee in providing the Services under this Agreement. The **Service Provider** and the **Customer** acknowledge that this Agreement does not create a partnership or joint venture between them, and is exclusively a contract for service. At no time will the **Service Provider** provide services that would require **Service Provider** to be registered and licensed with any federal or state regulatory body or self-regulating agency. The **Service Provider's** employees, subcontractors, and agents, if any, who perform services for the **Customer** under this Agreement shall also be bound by the provisions of this Agreement.

### Modification of Agreement

12. Any amendment or modification of this Agreement or additional obligation assumed by either party in connection with this Agreement will only be binding if evidenced in writing signed by each party or an authorized representative of each party.

### Costs and Legal Expenses

13. If the **Service Provider** deems that the **Customer** is in breach or default under this contract, the **Customer** shall reimburse the **Service Provider** upon demand for any legal fees and court (or other administrative proceeding such as arbitration) costs or expenses that the **Service Provider** incurs in connection with the breach or default, regardless whether suit is commenced or judgment entered. Such costs shall include legal fees, including contingency based attorney's fees at the rate in **Service Provider's** attorney fee agreement, and costs incurred in the negotiation of a settlement, enforcement of rights, litigation expenses or otherwise. Except as expressly stated otherwise in this document, the **Customer** must pay its own legal and other costs and expenses of negotiating, preparing, executing and performing its obligations under this document. The **Customer** understands that under no circumstance will the **Service Provider** pay any costs related to arbitration or litigation. It is the **Customer's** responsibility to pay all costs for both parties in the event of a dispute, default or breach of contract. This includes collection, contingency fees, damages and commission costs incurred by the **Service Provider** in recovering money owed by the **Customer**.

14. The **Customer's** officer or director signing this Agreement agrees to the jurisdiction set forth in Paragraph 26 and to be held personally liable for any payment owed under this Agreement, or any amendments attached hereto or incorporated by reference, to **Service Provider**. Nothing within this Agreement shall be interpreted as to waive or limit the personal liability of any of **Customer's** business partners or associates.

15. The **Customer** shall indemnify, defend, and hold harmless the **Service Provider** and its directors, officers, employees, and agents with respect to any claim, loss, expense, cost, judgment, demand, cause of action, debt or liability (the "Claims") and pay any costs or damages, including reasonable attorneys' fees, that will be awarded against the claimant to the extent the Claims.

16. The **Customer**, upon entering this Agreement, hereby warrants and guarantees to the **Service Provider** that to the best knowledge of the Customer, all statements, either written or oral, made by the Customer to the Service Provider are true and accurate, and contains no material misstatements, or omission fact. The **Service Provider** acknowledges that estimates made by the **Customer** are based upon the best information available to the **Customer** officers at the time of said estimates. The **Customer** acknowledges that the information it delivers to the **Service Provider** will be used by the **Service Provider** in preparing materials regarding the Company's business, including but not necessarily limited to, its financial condition, for dissemination to the public. Therefore the **Customer** shall hold the **Service Provider** harmless from any and all errors, omissions, misstatements, except those made in a negligent or intentionally misleading manner in connection with all information furnished by the **Customer** to **Service Provider**.

**Time of the Essence**

17. Time is of the essence in this Agreement. No extension or variation of this Agreement will operate as a waiver of this provision.

**Entire Agreement**

18. If the **Customer's** company fails to submit financial filings and disclosures on time, transitions to alternative reporting status with the Securities and Exchange Commission, decreases its listing status to a lesser exchange (defined as an exchange with lower overall trading volume or less stringent listing requirements), becomes a shell risk, shell, control dispute, dark or defunct, delinquent, caveat emptor, bankruptcy, yield, stop, expert market, or receives the warning "Unsolicited Quotes Only," the **Service Provider** can cancel the Agreement and retrieve operating expenses not exceeding the total compensation outlined in Paragraph 5.

19. This Agreement shall automatically rollover under the same terms and conditions unless written notice of termination or renegotiation is given by either the **Customer** or **Service Provider** at least 5 days prior to the end of the current term. For any subsequent rollovers of this Agreement, the payment terms set out in Paragraph 5b shall be modified such that payment is due upon the date of rollover.

20. The **Customer** must notify the **Service Provider** in writing in advance of a reverse split, name change, or symbol change so that the **Service Provider** can adjust the disseminations. If the **Customer** fails to notify the **Service Provider**, the **Service Provider** reserves the right to cancel the Agreement and retrieve operating expenses outlined in Paragraph 5.

**Limitation of Liability**

21. It is understood and agreed that the **Service Provider** will not violate any Securities Laws to perform services. See **EXHIBIT A** for disclosure that will be included in all communications. According to SEC regulation, it is illegal for the **Service Provider** to

work on a commission or performance basis so no guarantees or expectations can be made in terms of liquidity, appreciation, or any other variables. Any sections in this Agreement are not to be misconstrued otherwise.

### Inurnment

22. This Agreement will inure to the benefit of and be binding on the parties and their respective heirs, executors, administrators, successors and permitted assigns.

### Currency

23. Except as otherwise provided in this Agreement, all monetary amounts referred to in this Agreement are in United States dollars.

### Titles/Headings

24. Headings are inserted for the convenience of the parties only and are not to be considered when interpreting this Agreement.

### Gender

25. Words in the singular mean and include the plural and vice versa. Words in the masculine mean and include the feminine and vice versa.

### Governing Law

26. This Agreement is made in the State of Illinois, which state the parties agree has a substantial relationship to the parties and to the underlying transaction embodied hereby. Accordingly, in all respects, this Agreement and the obligations arising hereunder shall be governed by, and construed in accordance with, the laws of the State of Illinois applicable to contracts made and performed in such state and any applicable law of the United States of America. Each party hereby unconditionally and irrevocably waives, to the fullest extent permitted by law, any claim to assert that the law of any jurisdiction other than the State of Illinois governs this Agreement. All disputes, controversies, or claims arising out of, or in connection with, this Agreement shall be litigated in any state or federal court in Illinois. Each party hereby accepts jurisdiction of the State of Illinois and agrees to accept service of process as if it were personally served within such state. Each party irrevocably waives, to the fullest extent permitted by law, any objection that the party may now or hereafter have to the jurisdiction of the courts of Illinois and any claim that any such litigation brought in any such court has been brought in an inconvenient forum.

### Dispute Resolution

27. In the event a dispute arises out of or in connection with this Agreement the parties will attempt to resolve the dispute through friendly consultation.

28. If the dispute is not resolved within a reasonable period of time then the **Service Provider** reserves the sole right to determine if the parties will use mediation, arbitration or court litigation, which will take place in the State of Illinois, United States. If the **Service Provider** chooses to proceed with mediation, any or all outstanding issues will be submitted to mediation in accordance with any statutory rules of mediation. If mediation is not successful in resolving the entire dispute, any outstanding issues will be submitted to final and binding arbitration in accordance with the laws and jurisdiction of the State of Illinois, United States. The arbitrator's award will be final, and judgment will be entered upon it by any court having jurisdiction. The **Service Provider** shall have the sole right to select the mediation or arbitration firm and the rules by which the dispute will be resolved.

29. The **Customer** and individual hereby irrevocably waives personal service of process and consents to process being served in any such suit, action or proceeding by mailing a copy thereof to such party at the email address and postal address in effect for notices to it under this Agreement and agrees that such service shall constitute good and sufficient service of process and notice thereof. The total interest will be capped at the maximum amount allowable by law. The **Service Provider** must be served at its operating business address and can only be accepted by a verified manager or director of the company. Nothing contained herein shall be deemed to limit in any way any right to serve process in any manner permitted by law.

### Severability

30. In the event that any of the provisions of this Agreement are held to be invalid or unenforceable in whole or in part, all other provisions will nevertheless continue to be valid and enforceable with the invalid or unenforceable parts severed from the remainder of this Agreement.

### Waiver

31. The waiver by either party of a breach, default, delay or omission of any of the provisions of this Agreement by the other party will not be construed as a waiver of any subsequent breach of the same or other provisions.

**IN WITNESS WHEREOF the parties have duly executed this Service Agreement on this 8th of January 2025**

| Service Provider | Individually & On Behalf of Customer |
|---|---|
|  | *Bhaskar Panigrahi* |
| Manager of Alta Waterford | ConnectM Technology Solutions, Inc. |
| Hunkins Plaza | 2 Mt Royal Avenue, Suite #550 |
| Charlestown | Marlborough, MA 01752 |
| St. Kitts & Nevis | |

**EXHIBIT A** – Compliance Disclaimer

Alta Waterford reports/releases/profiles are commercial advertisements and intended for general information purposes only. We are engaged in the business of marketing and advertising companies for monetary compensation unless otherwise stated. The paying party can own shares and can liquidate them during the promotional period.

PLEASE NOTE WELL: Alta Waterford and its employees are not a Registered Investment Advisor, Broker Dealer or a member of any association for other research providers in any jurisdiction whatsoever and we are not qualified to give financial advice.

Our website and newsletter are for entertainment purposes only. This newsletter is NOT a source of unbiased information. Never invest in any stock featured on our site or emails unless you can afford to lose your entire investment. Gains mentioned in our newsletter and on our website may be based on End of Day or intraday data. The disclaimer is to be read and fully understood before using our site, or joining our email list.

Release of Liability: Through use of this email and/or website advertisement viewing or using you agree to hold Alta Waterford, its operators owners and employees harmless and to completely release them from any and all liability due to any and all loss (monetary or otherwise), damage (monetary or otherwise), or injury (monetary or otherwise) that you may incur. Alta Waterford sponsored advertisements do not purport to provide an analysis of any company's financial position, operations or prospects and this is not to be construed as a recommendation by Alta Waterford or an offer or solicitation to buy or sell any security.

COMPENSATION: Alta Waterford is often compensated in cash via bank wire by third parties for advertising services. Alta Waterford does not own any shares of profiled companies unless otherwise stated. Alta Waterford has been compensated one hundred thousand dollars for the dissemination of this paid advertisement from ConnectM Technology Solutions, Inc.. Alta Waterford does not investigate the background of any third party. The third party can have shares and may liquidate it, which may negatively affect the stock price. Compensations constitute a conflict of interest as to our ability to remain objective in our communication regarding the profiled company. The information contained in our coverage is based on sources which we believe to be reliable but is not guaranteed by us as being accurate and does not purport to be a complete statement or summary of the available data. Alta Waterford encourages readers and investors to supplement the information in these reports with independent research and other professional advice. All information on featured companies is collected from public sources only such as the profiled company's website, news releases, and corporate filings, but has not been verified in any way to ensure the publicly available information is correct. Alta Waterford makes no representations, warranties or guarantees as to the accuracy or completeness of the disclosure by the profiled companies. Further, Alta Waterford has no advance knowledge of any future events of the profiled companies which includes, but is not limited to, news press releases, changes in corporate structure, or changes in share structure.

None of the materials or advertisements in our coverage constitute offers or solicitations to purchase or sell securities of the companies profiled herein and any decision to invest in any such

company or other financial decisions should not be made based upon the information provide herein. Instead Alta Waterford strongly urges you conduct a complete and independent investigation of the respective companies and consideration of all pertinent risks. Readers are advised to review SEC periodic reports: Forms 10-Q, 10K, Form 8-K, insider reports, Forms 3, 4, 5 Schedule 13D. Alta Waterford is compliant with the Can Spam Act of 2003. Alta Waterford does not offer such advice or analysis, and Alta Waterford further urges you to consult your own independent tax, business, financial and investment advisors. Investing in micro-cap and growth securities is highly speculative and carries and extremely high degree of risk. It is possible that an investor's investment can be lost or impaired due to the speculative nature of the companies profiled. SMS Alerts: You will receive auto-dialed text alerts from Alta Waterford. No consent req'd for purchase. Msg & data rates can apply. Msg frequency varies. Reply STOP to stop, HELP for help. —/aWEwqewQQWWE Privacy policy: —/qeiiliqilioOo0

The Private Securities Litigation Reform Act of 1995 provides investors a 'safe harbor' in regard to forward-looking statements. Any statements that express or involve discussions with respect to predictions, expectations, beliefs, plans, projections, objectives, goals, assumptions or future events or performance are not statements of historical fact may be "forward looking statements". Forward looking statements are based on expectations, estimates, and projections at the time the statements are made that involve a number of risks and uncertainties which could cause actual results or events to differ materially from those presently anticipated. Forward looking statements in this action may be identified through use of words such as "projects", "foresee", "expects", "will", "anticipates", "estimates", "believes", "understands", or that by statements indicating certain actions "can", "could", or "might" occur. Understand there is no guarantee past performance will be indicative of future results. Past Performance is based on the security's previous day closing price and the high of day price during our promotional coverage.

In preparing our publications, Alta Waterford has relied upon information supplied by various public sources and press releases which it believes to be reliable; however, such reliability cannot be guaranteed. Investors should not rely on the information contained in this email and website. Rather, investors should use the information contained in this website as a starting point for doing additional independent research on the featured companies. Alta Waterford. and its owners, affiliates, subsidiaries, officers, directors, representatives and agents disclaim any liability as to the completeness or accuracy of the information contained in any advertisement and for any omissions of materials facts from such advertisement. Alta Waterford is not responsible for any claims made by the companies advertised herein, nor is Alta Waterford responsible for any other promotional firm, its program or its structure.